UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
EVA G. GRGAS,

                              Plaintiff,

                    -against-                                    **MEMORANDUM & ORDER**

                                                                06 CV 1466 (RJD) (JO)
JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY,

                              Defendant.
-------------------------------------------------------X
DEARIE, Chief Judge.

       Pursuant to 42 U.S.C. § 405(g), plaintiff Eva Grgas seeks to reverse defendant

Commissioner's ruling that she does not qualify for Social Security Disability ("SSD") or

Supplemental Security Income ("SSI") benefits. Both plaintiff and defendant move for judgment

on the pleadings. For the reasons stated below, the Court remands this case for further

proceedings.


                                    **BACKGROUND**

**A.      Factual and Procedural History**

       Plaintiff was born on July 12, 1959, is a high school graduate, and lives in Maspeth, New

York. Tr. 26. From 1987 until 2001, she worked as a collections clerk. Tr. 69.

       On October 19, 2001, plaintiff was injured in a car accident. Tr. 105. She was injured

again on January 1, 2002, when she slipped and fell on a wet floor. Tr. 113.

       On December 17, 2003, plaintiff filed for SSD benefits, alleging a disability onset date of

October 19, 2001. Tr. 58-60. Her SSD claim was denied on March 9, 2004, and she requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 27, 31.

Plaintiff was injured for a third time on April 25, 2004, in a second car accident. Tr. 158.

On December 31, 2004, plaintiff's insured status under the SSD program expired, and on March 1, 2005, she applied for SSI benefits. Tr. 259.

On October 27, 2005, an ALJ conducted a hearing to evaluate plaintiff's claim. Plaintiff was represented at the hearing by an attorney. Tr. 264. In a ruling dated November 22, 2005, the ALJ found that plaintiff retained the residual functional capacity to perform her past relevant work and therefore was not disabled. Tr. 15-23.

Plaintiff requested a review of the ALJ's ruling on December 19, 2005. Tr. 6. On January 26, 2006, the Appeals Council denied plaintiff's request for review. Tr. 3-5. This action followed on March 30, 2006.

## B.      Medical History

On October 22, 2001, three days after her first car accident, plaintiff was examined by Dr. Evelio Echenique, an internist. Plaintiff complained of headaches, nausea, dizziness, incontinence, insomnia, and anxiety. She also described pain in her jaw, severe neck pain and stiffness radiating to the left shoulder and forearm, upper back pain and stiffness, severe pain and stiffness in the lower back, tingling beneath the left kneecap, and pain in her left shoulder. Tr. 210.

Dr. Echenique's examination revealed severe muscle spasm and tenderness in plaintiff's bilateral upper trapezius and cervical paraspinal muscles, as well as decreased range of motion in

the cervical spine and a positive compression test. Tr. 211. The exam also revealed muscle spasm and tenderness in plaintiff's thoracic paraspinal muscles, muscle spasm and tenderness in her lumbar paraspinal muscles, decreased range of motion in her lumbar spine, a positive straight leg raising test, tenderness in plaintiff's left shoulder and both knees, and decreased strength in her left arm and hand. Tr. 212. Dr. Echenique made the following diagnoses: cervical derangement syndrome, post-traumatic cervical radiculitis, post-traumatic myofascitis of the neck and shoulder, sprain/strain of the thoracic and lumbosacral spine, cerebral concussion with loss of consciousness, post-concussion syndrome, and bilateral knee sprain. Id.

Dr. Echenique prescribed daily physical therapy and several medications, including Atarax, for anxiety; Daypro, an anti-inflammatory; Flexeril, a muscle relaxant; Pepcid, for indigestion; and Zostrix, for pain. Tr. 213. Dr. Echenique ordered X-rays, as well. An X-ray of plaintiff's right knee on October 23, 2001 revealed mild degenerative joint disease. Tr. 223. An X-ray of her cervical spine revealed straightening of the cervical lordosis and mild retrolisthesis (displacement) of the C3 vertebra onto the C4 vertebra. Tr. 224. An X-ray of the lumbosacral spine, performed on November 1, 2001, revealed straightening of the lumbar lordosis, a finding consistent with muscle spasm, and disc space narrowing at L5-S1. Tr. 225.

Dr. Echenique also requested magnetic resonance imaging ("MRI") scans of plaintiff's cervical spine, lumbar spine, and knees. The MRI of the cervical spine, performed on October 23, 2001, revealed a subligamentous posterior disc herniation at C5-C6 with impingement on the spinal cord. Tr. 175. The MRI of the lumbosacral spine, performed on November 30, 2001, revealed subligamentous posterior disc herniation at L4-L5 with impingement on the spinal cord and neural foramina bilaterally. Tr. 178. The MRI of plaintiff's left knee, performed on

November 8, 2001, revealed a tear of the medial meniscus with a displaced fragment, Tr. 176, and the MRI of her right knee, performed on November 21, 2001, revealed a tear of the medial meniscus and a sprain of the medial collateral ligament, Tr. 177.

On November 19, 2001, plaintiff was examined by Dr. Ronald Krinick, an orthopedic surgeon. She described left knee pain. Examination of the left knee revealed swelling, tenderness, deformity, and abnormal range of motion. Dr. Krinick diagnosed a medial meniscus tear and traumatic arthropathy. Tr. 105-6. Dr. Krinick operated on plaintiff's left knee on December 5, 2001, repairing two medial meniscus tears, a tear in the anterior cruciate ligament, and damage to the medial tibial plateau. Tr. 107-8. When Dr. Krinick next saw plaintiff, on December 10, 2001, he noted that she was improving, but that her strength and range of motion were still below normal. Tr. 110.

On January 7, 2002, six days after falling on a wet floor, plaintiff saw Dr. Krinick for a follow-up evaluation of her left knee. Dr. Krinick found that her right knee was "very painful and swelling," and that her strength and range of motion were below normal. Tr. 113.

On January 8, 2002, a week after her fall, plaintiff was examined by Dr. Echenique. She complained of pain in her back, right shoulder, and right hip. Dr. Echenique found tenderness, weakness, and decreased range of motion in the right shoulder. He also found spasm and tenderness in the lower lumbar paraspinal muscles, as well as decreased range of motion in the lumbar spine. Dr. Echenique began plaintiff on a physical therapy program and prescribed Celebrex, an anti-inflammatory. Tr. 217-218.

On January 9, 2002, Dr. Krinick operated on plaintiff's right knee, finding and repairing a medial meniscus tear and damage to the patella. Tr. 114-15. On January 14, 2002, Dr. Krinick

4

saw plaintiff for a follow-up exam. He determined that she was improving, although her strength and range motion were still below normal, and judged that she could return to work "in a light duty capacity." Tr. 117.

Dr. Krinick saw plaintiff again on March 4, 2002. He reported that the condition of her left knee was the same and that the condition of her right knee had improved. Her strength and range of motion remained below normal. Tr. 119.

On March 19, 2002, an MRI of plaintiff's right shoulder, performed at Dr. Echenique's request, indicated a partial tear in the anterior glenoid labrum. The test also showed joint effusion. Tr. 179. Several months later, on June 11, 2003, Dr. Krinick operated on plaintiff's right shoulder, addressing a rotator cuff tear, a labrum tear, impingement, and bursitis. Tr. 132-33.

On January 13, 2004, Dr. Echenique completed a questionnaire about plaintiff for the Social Security Administration ("SSA"). He reported that plaintiff suffered from lower back pain, radiculitis, a herniated disc at L4-L5, a torn rotator cuff, and derangement of the left knee. He also reported decreased range of motion and tenderness in the cervical and lumbar regions of plaintiff's spine; a positive straight leg raising test; decreased range of motion, joint effusion, and tenderness in her left knee; and decreased range of motion in her right shoulder. Plaintiff was taking Celebrex, Flexeril, and Vicodin. According to Dr. Echenique, plaintiff could lift only ten pounds, could stand and/or walk only two hours per day, and could sit for fewer than six hours per day. Tr. 139-144.

Dr. Kyung Seo, an orthopedist and a consulting physician to the SSA, examined plaintiff on February 11, 2004. Dr. Seo observed mild spasm in the paraspinal muscles of plaintiff's

5

lower back and mild crepitation in both knees. The straight leg raising test was positive. Dr. Seo also recorded the range of motion of plaintiff's spine, arms, elbows, and wrists, but did not explain the significance of these findings. Tr. 147. Dr. Seo diagnosed plaintiff with lower back derangement and "probably degenerative spondylosis," and offered the following assessment of plaintiff's functional capacity: "Functionally, due to rigid spine with mild spasm and aching pain of the knee and right shoulder, sitting is slightly limited, standing is slightly limited, walking is slightly limited, and bending, lifting, and carrying heavy objects are slightly limited." Tr. 148. Dr. Seo also ordered X-rays of plaintiff's left knee and lumbosacral spine. The knee X-ray was negative; the spine X-ray showed a transitional L5 vertebral body but otherwise was "unremarkable." Tr. 149.

On April 27, 2004, two days after her second car accident, plaintiff visited Dr. Echenique. She complained of headaches, insomnia, anxiety, neck pain and stiffness radiating to the right shoulder blade and upper arm, right upper back and mid-back pain and stiffness, and lower back pain and stiffness radiating to the thighs. Dr. Echenique found muscle spasm and tenderness in the bilateral upper trapezius muscles, the cervical paraspinal muscles, the right upper and middle thoracic paraspinal muscles, and the bilateral upper lumbar paraspinal muscles. Range of motion was limited in plaintiff's cervical and lumbar spine. The straight leg raising test was negative. Dr. Echenique also reported tenderness in the right shoulder and tenderness and abnormal range of motion in the left knee. Tr. 214-216. Dr. Echenique made the following diagnoses: aggravation of prior injuries to plaintiff's right shoulder, left knee, and cervical and lumbar spine; sprain/derangement of the cervical and lumbar spine; sprain/strain of the thoracic spine; right shoulder sprain; and left knee sprain. Tr. 216.

6

Dr. Echenique prescribed physical therapy and Celebrex. Tr. 216. He also ordered more testing. An X-ray of the cervical spine, performed on April 27, 2004, showed retrolisthesis at C3-C4; an X-ray of the thoracic spine showed mild scoliosis; an X-ray of the lumbosacral spine showed a tilt to the left; and an X-ray of the left knee showed slight soft tissue fullness consistent with joint effusion. Tr. 180-181. An MRI of plaintiff's lumbosacral spine, performed on June 21, 2004, again showed a subligamentous posterior disc herniation at L4-L5 impinging on the spinal canal and neural foramina bilaterally. Tr. 183. An MRI of the thoracic spine, performed on June 23, 2004, showed posterior disc bulges at T7-T8 and T8-T9, both impinging on the anterior aspect of the spinal canal. Tr. 184. Finally, an MRI of plaintiff's knee, performed on May 20, 2004, again revealed a tear of the medial meniscus. Tr. 182.

Plaintiff returned to Dr. Krinick on June 10, 2004, approximately six weeks after her second car accident, complaining of knee and back pain, swelling, weakness, and fever. Dr. Krinick's examination of the left knee revealed evidence of effusion and crepitus, and an MRI of the left knee indicated a medial meniscus tear. Dr. Krinick's impression was of a left knee medial meniscus tear and left knee traumatic arthropathy. Tr. 161-63. On June 18, 2004, Dr. Krinick again operated on plaintiff's left knee. He repaired a medial meniscus tear and damage to the patella. Tr. 168-69. When Dr. Krinick next saw plaintiff, on July 22, 2004, he reported that her condition was improving. He found no indication of effusion or crepitus, and no deformity. He prescribed Celebrex, physical therapy, and a home exercise program. Tr. 166-67.

On June 25, 2004, plaintiff was examined by Dr. Jeffrey Goldstein, a colleague of Dr. Krinick's. She reported lower back pain, as well as numbness, tingling, weakness, difficulty sleeping, and emotional problems. Dr. Goldstein observed diffuse paraspinal spasm. His

impression was that plaintiff had a thoracic spine sprain/strain and degenerative disc disease at L4-L5. Tr. 164.

Dr. James Liguori, a neurologist, examined plaintiff on July 16, 2004. Plaintiff complained of pain in her neck, left knee, and middle and lower back, as well as numbness and tingling in the right hand and left foot. She was experiencing muscle spasms in the lumbar, thoracic, and cervical muscles. Her straight leg raising ability was limited to between thirty and forty degrees. Examination via electromyography ("EMG") indicated right C5-C6 radiculopathy. Dr. Liguori's impressions were cervical radiculopathy with spinal cord involvement, thoracic derangement, and lumbosacral radiculopathy. Tr. 158-60. On August 12, 2004, Dr. Liguori performed an EMG on plaintiff's legs. It was within normal limits. Tr. 202-04. On September 2, 2004, Dr. Liguori performed somatosensory evoked potential studies (nerve function tests) on plaintiff's legs and arms. They were within normal limits. Tr. 197-200. Dr. Liguori also treated plaintiff with trigger point injections aimed at alleviating her pain. These began in July 2004 and continued for at least a year. Tr. 159, 186-96.

On May 17, 2005, when plaintiff made her final visit to Dr. Echenique, she reported that she was experiencing less shoulder pain, but that her lower back pain persisted. Dr. Echenique found decreased range of motion in her spine. He explained that her right shoulder and lumbar spine injuries were "permanent in nature and have left her with residual post-traumatic right shoulder and chronic low back pain and radiculitis." The result of these injuries, according to Dr. Echenique, was "partial permanent disability." Tr. 217-20.

On October 24, 2005, Dr. Liguori completed a Medical Source Statement for the SSA. He described plaintiff as suffering from cervical radiculopathy, lumbosacral radiculopathy, and

8

median mononeuropathy. He reported that plaintiff could sit for only one to two hours in an eight-hour workday and for fewer than fifteen minutes without a break; that plaintiff could stand or walk for only one to two hours in an eight-hour workday and for only fifteen minutes without a break; and that plaintiff would need to lie down for at least six hours out of an eight-hour workday. He also said she could rarely if ever lift one to five pounds. Tr. 206-208.

## C.    The Administrative Hearing

### 1.    Plaintiff's Testimony

Plaintiff appeared at a hearing before an ALJ on October 27, 2005. Her daughter drove her to the hearing. Plaintiff testified that she only drove short distances, and only once or twice a week. Tr. 270. She stated that she was experiencing back, arm, and knee pain and that she underwent trigger point injections in her back every two to four weeks. Tr. 272-74. Plaintiff claimed that she had numbness in her right arm and that the shoulder surgery had not taken care of her problem. Tr. 275. Her left knee, she claimed, tended to get swollen and painful, causing her to shift her weight to the right knee, which then would begin to hurt as well. Tr. 276-77. She testified that she had suffered from migraines since the car accident and that these were being treated with neck injections. Tr. 278. For a time, she explained, she had been on a medication she described as "hydrocortisone," which she said distorted her thinking. Tr. 280.[1] She also testified that she was taking Ultracet, an anti-inflammatory. Tr. 277.

When asked to describe the physical requirements of her job as a collections clerk,

------

[1] Counsel for plaintiff now suggests that she was referring to "hydrocodone," the generic form of the painkiller Vicodin. Pl.'s Mem. at 14.

plaintiff testified that it had involved "mostly sitting" and that she had been required to lift "maybe 15 pounds." Tr. 271. On a typical day at home, according to plaintiff, she watched television, walked down the block to see her brother, and spent much of the day lying down. Tr. 281. Her daughter did the cooking, cleaning, shopping, and laundry. When her legs were stiff, her daughter helped her do exercises. Tr. 283. She testified that she could walk only one block, could stand up only for fifteen minutes at a time, and could sit for only ten or fifteen minutes. Tr. 284. She claimed that she frequently dropped objects from her right hand, was unable to write a page because her hand became weak, and was unable to take buses, because they jerked around, or the subway, because of the stairs. Tr. 285-86, 289. She testified that she spent ninety percent of her time lying down. Tr. 286.

## 2. Medical Expert's Testimony

Dr. Ernest Abeles, an orthopedic surgeon, testified at plaintiff's hearing as a medical expert. He did not examine plaintiff. His testimony was based on his review of plaintiff's medical records. He received many of those records only when he arrived at the hearing, and the ALJ ordered a recess so that he could review them before testifying. Tr. 266.

Dr. Abeles described the record as "inconsistent" in that it described plaintiff as suffering from a subligamentous disc herniation at L4-L5, but also contained no documentation of nerve conduction problems in plaintiff's legs. On this basis, Dr. Abeles described the MRIs of plaintiff's lumbar spine as "a little over-read probably." Tr. 300. He conceded, however, that he had not reviewed the films himself. Tr. 317. Dr. Abeles also suggested that plaintiff's shoulder problems had been resolved through surgery and that the symptoms of which she now

complained indicated "mild to moderate [cervical] radiculopathy involving the right upper extremity, rather than a shoulder problem." Tr. 301. He explained further that plaintiff had once had "some degree of problems with her knees," but that those problems, as well, had been addressed "[p]retty much" through surgery, and that the X-rays of plaintiff's knees did not reveal a "severe arthritic problem." Tr. 302.

Dr. Abeles concluded that none of plaintiff's impairments was severe, though he conceded that "possibly the combination of all these items may cause a certain degree of disability." Tr. 302. He described Dr. Liguori's finding that plaintiff needed to lie down much of the day as "going a little bit overboard." Tr. 303. He testified that plaintiff's sitting, standing, and walking were all "slightly limited." Tr. 304. Finally, he opined that plaintiff could sit for six hours, with breaks, in an eight-hour workday, and that she could lift ten pounds "regularly" and twenty pounds "occasionally." Tr. 304-05.

### 3. Vocational Expert's Testimony

Andrew Pasternak, a vocational expert, also testified at the hearing. Pasternak testified that plaintiff's job as a collections clerk was "sedentary" under SSA regulations, although some of the lifting she did was demanding enough to be considered "light." Tr. 322. Pasternak opined that if plaintiff was capable of doing "light" work, as the testimony of Dr. Abeles had suggested—that is, lifting and carrying twenty pounds occasionally and ten pounds frequently, standing and walking a total of two hours per day, and sitting a total of six hours per day, provided that she could alternate between sitting and standing—she could perform her past work as a collections clerk. Tr. 323. Pasternak also responded to questioning by the ALJ about what

kinds of work plaintiff could perform under other combinations of physical limitations. He

testified that if plaintiff was limited to sitting and standing for fifteen minutes at a time, as Dr.

Liguori's report indicated, she was unable to work, but that if he considered only her professed

inability to lift and carry more than eight pounds, she was still capable of functioning as an order

clerk or surveillance system monitor. Tr. 325-28. Likewise, when asked about plaintiff's

account of difficulty grasping objects with her right hand, Pasternak responded that this would

prevent her from serving as an order clerk, but not from working as a surveillance systems

monitor, since she could shift the simple tasks that were required (dialing a phone, "enter[ing]

some information onto a record") to her left hand. Tr. 328-29.


### 4. The ALJ's Ruling

In determining whether plaintiff was entitled to benefits, the ALJ applied the five-step

process required by federal regulations and described below. First, she found that plaintiff had

not engaged in substantial gainful activity since her alleged disability onset date. Second, she

found that plaintiff had three "severe impairments": "cervical disc disease and lumbar disc

disease and chrondomalacia in the knees." Third, she found that plaintiff's impairments did not

meet or equal the specific impairments described in the regulations. Tr. 22. None of the ALJ's

first three findings is in dispute.

The ALJ's fourth finding, disputed by plaintiff, was that plaintiff retained the residual

functional capacity to perform "light work" as defined at 20 C.F.R. § 404.1567. Tr. 22. More

specifically, the ALJ found that if plaintiff were permitted to alternate sitting and standing as

needed, she could stand or walk for two hours per day; sit a total of six hours per day; lift or carry

twenty pounds occasionally; and lift or carry ten pounds frequently. On this basis, and in accordance with the testimony of the vocational expert, the ALJ found that plaintiff could perform her past relevant work as a collections clerk.

In determining plaintiff's residual functional capacity, the ALJ took into account plaintiff's description of her own medical condition, but found it unconvincing: "I find that claimant's allegations as to the persistence and intensity of her symptoms and functional limitations are exaggerated and lack credibility as inconsistent with the entire record." The ALJ found insufficient evidence to support plaintiff's claimed inability to grip objects with her hands. She found further that plaintiff's knee and shoulder problems were "taken care of by the surgeries." She acknowledged a period of disability following each surgery, but determined that plaintiff was not disabled by any of the surgeries for twelve consecutive months. Tr. 20.

The ALJ also declined to grant controlling or even significant weight to the opinions of Drs. Liguori and Echenique. Dr. Liguori's opinion, she declared, was "inconsistent with other substantial evidence in the record, as explained by Dr. Abeles and as opined by Dr. Seo . . . and as shown in his examination . . . ." Tr. 20. As for Dr. Echenique's conclusion that plaintiff could not sit for more than six hours a day, the ALJ speculated that this judgment "most likely" derived from Dr. Echenique's finding that plaintiff suffered from lumbar radiculopathy, and deemed such a finding "contrary to the documentary evidence, which shows no lumbar radiculopathy is present." Finally, without specifically addressing Dr. Echenique's other findings, the ALJ observed: "The balance of [Dr. Echenique's] opinion is consistent with the entire record, including with the opinion of Dr. Abeles, and is therefore, given significant weight." Tr. 20.

The ALJ's final finding, also disputed, was that "even if the burden shifted to the

Commissioner . . . at the fifth step in the evaluation process to establish that a significant number

of jobs exist in the national economy that claimant could perform . . . there is still a significant

number of jobs that she can perform." Tr. 21. The ALJ reached this conclusion by "add[ing]

hypothetical limitations based on the claimant's testimony," and determining that even if plaintiff

was unable to lift more than eight pounds, and therefore could not work as a collections clerk,

she could perform other unskilled sedentary work described by the vocational expert, e.g., order

clerk or surveillance system monitor. Tr. 21.


## DISCUSSION

### A.    Legal Standards

#### 1.    Standard of Review

A district court may set aside a ruling of the SSA as to a claimant's eligibility for

disability benefits only in two circumstances: "[(1)] if the factual findings are not supported by

'substantial evidence' or [(2)] if the decision is based on legal error." Shaw v. Chater, 221 F.3d

126, 131 (2d Cir. 2000) (quoting 42 U.S.C. 405(g)). "'Substantial evidence' in this context is

'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" Jones v. Apfel, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999)

(quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

It is for the Commissioner, not the Court, to weigh conflicting evidence. Clark v.

Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). Thus, "[i]f the reviewing court finds

substantial evidence to support the commissioner's final decision, that decision must be upheld,

even where substantial evidence supporting the claimant's position also exists." Punch v.

Barnhart, No. 01 Civ. 3355, 2002 U.S. Dist. LEXIS 8882, at *28 (S.D.N.Y. May 21, 2002). The

Court "may not substitute its own judgment for that of the [Commissioner], even if it might

justifiably have reached a different result upon a de novo review." Jones v. Sullivan, 949 F.2d

57, 59 (2d Cir. 1991).


### 2.     Determining Eligibility for Benefits

The Social Security Act provides that a claimant is eligible for benefits "only if his

physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.

§ 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B). See Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)

("The definition of 'disabled' is the same for purposes of receiving SSD and SSI benefits.").

The SSA has promulgated regulations establishing a five-step process for determining

whether a particular claimant is eligible:

> First, the [Commissioner] considers whether the claimant is currently engaged in
> substantial gainful activity. If he is not, the [Commissioner] next considers
> whether the claimant has a "severe impairment" which significantly limits his
> physical or mental ability to do basic work activities. If the claimant suffers such
> an impairment, the third inquiry is whether, based solely on the medical evidence,
> the claimant has an impairment which is listed in Appendix 1 of the regulations.
> If the claimant has such an impairment, the [Commissioner] will consider him
> disabled without considering vocational factors such as age, education, and work
> experience . . . . Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe impairment, he has the
> residual functional capacity to perform his past work. Finally, if the claimant is
> unable to perform his past work, the [Commissioner] then determines whether
> there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (alterations in original) (quoting Berry v.

15

Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (citing 20 C.F.R. § 404.1520)).

### 3. The Treating Physician Rule

SSA regulations define a "treating source" as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. In evaluating a claim, the Commissioner ordinarily ascribes controlling weight to the opinion of a treating physician: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). This presumption does not apply to dispositive issues, like whether a claimant is disabled, since the regulations expressly reserve these issues to the Commissioner. 20 C.F.R. § 404.1527(e).

Nor does the presumption apply where a treating physician's opinion fails to meet either of the two conditions articulated in the regulations (that is, that it be well-supported and not inconsistent with other substantial evidence in the record). In such a case, the Commissioner determines how much weight to give the opinion by considering several factors, including "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." Clark, 143 F.3d at 118 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).

However, an ALJ may not "arbitrarily substitute his own judgment for competent medical

16

opinion . . . . While an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (quoting McBrayer v. Sec'y of Health & Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)) (alterations in original).

ALJs also are instructed not to "reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." Rosa, 168 F.3d at 79 (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("Even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.") (alteration in original)). See also Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record. This duty exists even when the claimant is represented by counsel . . . .") (internal citation omitted).

In every case, the ALJ must offer "good reasons" for the weight she ascribes to a treating physician's opinion. 20 C.F.R. § 404.1427(d)(2). See also Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) (holding that "the Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

### 4. Weighing a Claimant's Testimony

A claimant's own account of her symptoms, without more, will not suffice to justify an award of benefits: "[S]tatements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 404.1529(a). Moreover, where a claimant's credibility is in question, "the Commissioner, not the reviewing court, is the appropriate party to make credibility findings concerning the claimant and . . . such findings must be accepted by the reviewing court unless they are clearly erroneous." Punch, 2002 U.S. Dist. LEXIS 8882, at *43-44.

Nevertheless, in determining whether a claimant is eligible for benefits, the ALJ must "consider all [the claimant's] symptoms, including pain . . . ." 20 C.F.R. § 404.1529(a). The regulations inform claimants that ALJ's "will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2). See also Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003) (quoting Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997) (noting that "[a] patient's report of complaints, or history, is an essential diagnostic tool.")).

### B. Application

The Court finds that the ALJ erred in determining that she should not grant controlling weight to the opinions of treating physicians Liguori and Echenique. The ALJ's determination that plaintiff was able to work in the national economy under certain additional "hypothetical

limitations" was erroneous, as well. The Court also notes that the ALJ's credibility

determination with regard to plaintiff's own testimony does not clearly reflect that the ALJ

considered all of the relevant factors. Accordingly, the Court remands plaintiff's case for further

proceedings consistent with this opinion.


### 1.    Treating Physician Liguori

As noted above, Dr. Liguori diagnosed plaintiff as suffering from cervical radiculopathy,

median mononeuropathy, and lumbrosacral radiculopathy. He also opined that she could rarely

or never lift five pounds, that she could neither sit nor stand for more than fifteen minutes at a

time, and that she would need to spend much of the day—at least six hours of an eight-hour

workday—lying down. Tr. 206-08. In explaining her decision not to grant controlling or even

significant weight to Dr. Liguori's opinion, the ALJ described it as "inconsistent with other

substantial evidence in the record, as explained by Dr. Abeles and as opined by Dr. Seo . . . and

as shown in his examination . . . ." Tr. 20. She cited several of Dr. Seo's clinical findings in

particular:

> [N]o sensory deficit, normal motor strength in both the upper and lower
> extremities, no muscle atrophy in the upper extremities, no difficulty standing up
> from a sitting position, no difficulty getting on and off the examination table and
> normal fine motor activity, normal gripping strength of both hands, no paraspinal
> muscle spasms in the cervical spine and only mild spasm of the paraspinal
> muscles of the lower back.

Tr. 20. Although Dr. Liguori was a treating physician with extensive firsthand knowledge of

plaintiff's condition, the ALJ might properly have declined to grant controlling weight to his

opinion, provided that his opinion was, as she indicated, inconsistent with other substantial

19

evidence in the record. 20 C.F.R. § 404.1527(d)(2). In doing so on the basis of the opinions of

Drs. Abeles and Seo, however, the ALJ erred.

First, the ALJ erred by relying on the opinion of Dr. Abeles. Although the opinion of a

consulting physician may, under some circumstances, constitute "other substantial evidence"

sufficient to justify an ALJ's decision not to grant controlling weight to the opinion of a treating

physician, Punch, 2002 U.S. Dist. LEXIS 8882, at *35-36 (citing Richardson, 402 U.S. at 402),

the opinion of Dr. Abeles does not. Dr. Abeles's opinion was based on his review of the record

—a review that appears to have taken place in a haphazard fashion, with a significant portion of

the record provided to him only upon his arrival at the hearing. Perhaps as a result, his testimony

suggested that he did not have command of the relevant facts. Under questioning by plaintiff's

attorney, Dr. Abeles indicated that his evaluation of plaintiff's condition, and his judgment that

she did not suffer from lumbar radiculopathy, were based in part on the absence of spasm and

straightening in plaintiff's lumbar paraspinal muscles:

> [Q]: So, doctor, as stated before, the MRI show [sic] a subligamentous
> posterior disc herniation at L4-5 impinging on the anterior aspect of the
> spinal canal and neural foramena bilaterally. My question to you is, with a
> degree of medical certainty isn't it possible for those MRI results to
> produce back pain?
> [A]: I would say under the terms of anything is possible, it is possible. But
> likely, no.
> [Q]: And what is the reason you're saying, likely, no?
> [A]: Likely, because there are other things I'd look for in terms of back pain. I
> expect spasm or straightening of the lumbosacral spine. I expect arthritic
> changes. Those are the things I'm looking for. This is something that is
> usually coincident with radiating pain due to herniated—due to
> radiculopathy.

Tr. 308-09. Shortly afterward, however, when directed to the appropriate portion of the record

by plaintiff's attorney, Dr. Abeles conceded that the record did, indeed, contain a finding (by Dr.

20

Echenique) of spasm in plaintiff's lumbar paraspinal muscles. He explained his mistake by reference to his delayed examination of the file:

> Q: Well, regarding the lumbar spine doesn't [Dr. Echenique] indicate spasm and positive straight leg raising?
>
> A: Yes, he does.
>
> Q: Okay.
>
> A: I'm not saying he doesn't.
>
> Q: —in combination of an individual that's been complaining of back pain for several years, with a positive MRI finding of herniated disc impinging on the spinal canal with spasm in [sic] straight leg raising, positive straight leg raising, your opinion would still be that this would not—she was not having back pain?
>
> A: I didn't say that she wasn't having back pain. You're asking me if the MRI would be the cause of the back pain, and I'm saying that in terms of that I think there's other reasons, other causes. I'm not saying now that we find some evidence of radiculopathy that that's not so.
>
> Q: So—
>
> A: I mean, I didn't have this in my records, and I acknowledge that.

Tr. 312. Later, under questioning by the ALJ, Dr. Abeles acknowledged that the record contained evidence of straightening of the plaintiff's lumbrosacral spine, as well:

> Q: Where it talks about straightening of the lumbar lordosis, what significance is that when it shows that on X ray?
>
> A: That gives me an X ray that there's spasms going on, muscle spasm. Straightening or reversal of the lumbar lordosis.

Tr. 317. The hearing record thus demonstrates not only that Dr. Abeles evaluated plaintiff's condition based on a last-minute review of her medical records, but also that this review left him unaware of clinical findings whose existence undermined his assessment of her condition. Accordingly, although the opinion of a consulting physician may constitute "substantial evidence" under some circumstances, the Court finds that the opinion of Dr. Abeles did not, and

that the ALJ's reliance on it was error.[2]

That the ALJ improperly relied on Dr. Abeles would not require a remand, if the ALJ had cited other substantial evidence that was inconsistent with Dr. Liguori's opinion. But her reliance on Dr. Seo's opinion for this purpose was error, as well, since the opinions of Drs. Seo and Liguori are not necessarily inconsistent. Dr. Seo examined plaintiff on February 11, 2004, *before* plaintiff's second car accident, which occurred on April 25, 2004. Dr. Liguori first examined plaintiff on July 16, 2004, several weeks *after* the accident. It is possible, even likely, that the apparent inconsistency between their reports—as the ALJ noted, Dr. Seo found "no paraspinal muscle spasms in the cervical spine and only mild spasm of the paraspinal muscles of the lower back," Tr. 20, while Dr. Liguori found that plaintiff was experiencing muscle spasms in the cervical, thoracic, and lumbar regions, and diagnosed her with both cervical and lumbar radiculopathy, Tr. 159—is explained by the intervening accident. Indeed, when plaintiff visited Dr. Echenique on April 27, 2004, two days after her accident, his findings were consistent with those reported three months later by Dr. Liguori, rather than with those reported three months

---

[2]Even if the Court were to find that Dr. Abeles's opinion constituted substantial evidence, the ALJ mischaracterized that opinion in her assessment of plaintiff's residual functional capacity. She deemed plaintiff capable of "light work," in part based on her finding that plaintiff was able to lift "10 pounds frequently." Tr. 21. See also 20 C.F.R. § 404.1567 ("Light work involves . . . frequent lifting or carrying of objects weighing up to 10 pounds."). The ALJ also cited the opinion of Dr. Abeles for the proposition that plaintiff's functional capacity included "lifting/carrying . . . frequently 10 pounds." Tr. 19. But this is contrary to Dr. Abeles's testimony:

A:      . . . I think certainly she cannot lift more than 10 pounds regularly, occasionally 20 pounds. And I would, again as I said before, limit her standing and walking to two hours.
Q:      And would the carrying be the same?
A:      Yes.
Q:      Twenty pounds occasionally and ten pounds frequently?
A:      Ten pounds regularly. Tr. 304.

22

previously by Dr. Seo. They included spasm and tenderness in plaintiff's cervical, thoracic, and lumbar paraspinal muscles and limited range of motion in her cervical and lumbar spine.[3] Tr. 215. Thus, to the extent that the ALJ relied on Dr. Seo's opinion as substantial evidence inconsistent with the opinion of Dr. Liguori, she erred.

## 2. Treating Physician Echenique

On January 13, 2004, as noted above, Dr. Echenique diagnosed plaintiff with lower back pain, radiculitis, a herniated disc at L4-L5, a torn rotator cuff, and left knee derangement. He also opined that plaintiff could stand or walk no more than two hours per day, could sit for fewer than six hours per day, and could lift no more than ten pounds. Tr. 139-44. When he examined plaintiff on April 27, 2004, subsequent to her second car accident, Dr. Echenique's diagnoses were sprain/derangement of plaintiff's cervical and lumbar spine, sprain/strain of the thoracic spine, and sprains of the left knee and right shoulder. Tr. 216. The ALJ declined to grant controlling weight to any of Dr. Echenique's findings, and declined to grant even significant weight to his finding that plaintiff could sit for no more than six hours per day. She explained:

> I note that Dr. Echenique most likely considered in his assessment, lumbar radiculop[a]thy, which Dr. Echenique states in his records, is present. Lumbar radiculopathy, however, is contrary to the documentary evidence, which shows no lumbar radiculopathy is present.

Tr. 20.

---

[3]The ALJ actually acknowledged Dr. Echenique's findings, but dismissed them with the observation, loosely quoted from Dr. Abeles's testimony, that "such symptoms may come and go." Tr. 20. See Tr. 313 (testimony of Dr. Abeles that "[t]hese things come and go"). Of course, if such symptoms do in fact "come and go," then even if plaintiff had *not* been re-injured between her examinations by Drs. Seo and Liguori, the detection of such symptoms by only one of the two doctors would not necessarily constitute inconsistency.

The Court finds that this was error, for three reasons. First, although the regulations reserve the ultimate determination of a claimant's residual functional capacity to the Commissioner, 20 C.F.R. § 404.1527(e)(2), they also require that ALJs give "good reasons" for the weight they ascribe to the opinions of treating physicians, 20 C.F.R. § 404.1527(d)(2), and the Second Circuit has indicated plainly its willingness to reverse the rulings of ALJs who fail to comply with this requirement, Halloran, 362 F.3d at 33. The ALJ's terse explanation, quoted in its entirety above, of her refusal to ascribe even "significant" weight to the opinion of Dr. Echenique, a physician whose treatment relationship with plaintiff included numerous firsthand consultations over a span of more than three years, is insufficient. Second, to the extent that the ALJ relied on her own determination that the "documentary evidence" did not support a diagnosis of lumbar radiculopathy—as she appears to have done—she exceeded her authority. See Rosa, 168 F.3d at 79 (remanding where the ALJ "improperly set [her] own expertise against that of the treating physician," since "as a lay person[], the ALJ simply was not in a position to know whether the absence of muscle spasms would in fact preclude the [treating physician's assessment].") (first and second alterations in original, internal quotation marks and citation omitted). Finally, even if the ALJ intended to ground her handling of Dr. Echenique's opinion on her earlier discussion of arguably inconsistent findings in the opinions of Drs. Abeles and Seo, she erred nonetheless. Dr. Abeles's opinion is not substantial evidence, as explained above. Meanwhile, Dr. Echenique's opinion of April 27, 2004, like Dr. Liguori's July 2004 opinion, is not necessarily inconsistent with Dr. Seo's opinion of February 2004, due to the intervention of plaintiff's second car accident on April 25, 2004.

24

### 3. "Hypothetical Limitations"

The ALJ offered an alternative ground for her judgment that plaintiff was not disabled:

> [E]ven if the burden shifted to the Commissioner of Social Security at the fifth step in the evaluation process to establish that a significant number of jobs exist in the national economy that claimant could perform, with the additional limitations, there is still a significant number of jobs that she can perform.

Tr. 21. This statement appeared to be based on the testimony of the vocational expert as to whether plaintiff could function as an order clerk or surveillance system monitor even if she were subject to several "hypothetical limitations":

> I also added hypothetical limitations based on the claimant's testimony that she could lift no more than 8 pounds, and can walk 1 block at a time and stand for 15 minutes at a time and sit for 10 to 15 minutes at a time, but that she could stand/walk a total of 2 hours a day and sit a total of 6 hours a day. The vocational expert testified that the work as a collection clerk could not be performed because more than 8 pounds lifting is required. He said, however, that the following unskilled sedentary work could be performed: order clerk . . . and surveillance system monitor . . . .

Tr. 21. Finally, the ALJ elicited testimony from the vocational expert that plaintiff could function as a surveillance system monitor even with the added limitation, based on plaintiff's own testimony, that she was unable to grasp objects with her right hand, since she could simply transfer the necessary functions to her left hand. Tr. 21.

The ALJ's reasoning in the alternative does not save her ruling, because she mischaracterizes the testimony of the vocational expert on whom she relies. The "hypothetical limitations" described above are essentially the same as those described in Dr. Liguori's opinion. The implication of the ALJ's statement, therefore, is that even if she had found Dr. Liguori's opinion controlling, she would have found plaintiff not to be disabled, since the vocational expert testified that plaintiff could function as an order clerk, or at least as a surveillance system

monitor, even with those limitations. But the vocational expert offered no such testimony. In fact, he testified that if plaintiff were subject to the third of the ALJ's "hypothetical limitations"—the inability to stand or sit for more than fifteen minutes at a time—"her physical capacity [would be] below that required for work." Tr. 325-26. Thus, if Dr. Liguori's opinion is controlling (and the ALJ's ruling does not establish otherwise), the vocational expert's testimony indicates that as of October 24, 2005, the date of Dr. Liguori's Medical Source Statement, plaintiff was unable to perform, not only her own job, but any job.

### 4. Plaintiff's Testimony

As noted above, the SSA regulations indicate that ALJ's are not to reject claimants' testimony about pain and other symptoms on the sole ground that such testimony is unsubstantiated by the available objective evidence. 20 C.F.R. § 404.1529(c)(2). Instead, "[s]ince symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," ALJs must "carefully consider any other information [claimants] may submit about [their] symptoms." 20 C.F.R. § 404.1529(c)(3). In finding that plaintiff's testimony about the pain she experienced was "exaggerated" and lacked credibility, the ALJ offered only the explanation that plaintiff's account was "inconsistent with the entire record," accompanied by assertions that plaintiff's knee and shoulder problems were "taken care of" by surgery, and that "the evidence [did] not support" plaintiff's testimony about being unable to grip objects properly with her hands. Tr. 20. The ALJ's opinion reflects no consideration at all of the credibility of plaintiff's testimony about her back pain. The record thus suggests that the ALJ did not comply with the requirement that she carefully consider plaintiff's own

testimony about her symptoms.

## CONCLUSION

As explained above, the Court finds that the ALJ committed several legal errors in determining that plaintiff was not disabled. The Court therefore remands plaintiff's case for further proceedings consistent with this opinion. On remand, the ALJ should reconsider whether the opinions of Drs. Liguori and Echenique merit controlling weight. If the ALJ determines that they do not, she should offer good reasons for the weight she ascribes to those opinions. The ALJ also should offer a thorough explanation of her assessment of the credibility of plaintiff's own testimony. Finally, in all respects, her analysis must accurately reflect the record before her.

SO ORDERED.

Dated: Brooklyn, New York
       July 17, 2007

                                        s/ Judge Raymond J. Dearie

                                        RAYMOND J. DEARIE
                                        United States District Judge